# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Rickey Jones, Tammy Henderson,
Deona Griffo, Brianna Henderson,
Alonzo Henderson, Marlon Henderson,
John Pitts, Maxine Pitts, Lesley Moore,
and Tami Moore,

Civil No. 04-4856 (DWF/AJB)

              Plaintiffs,

v.

City of Minneapolis, including but not
limited to its Police Department; Richard
Zimmerman, in his official and individual
capacities; Steve Wuorinen, in his official
and individual capacities; Kevin Lazarchic,
in his official and individual capacities;
Scott Downing, in his official and individual
capacities; and John Does 1-10,

              Defendants.

**MEMORANDUM
OPINION AND ORDER**

---

Jill Clark, Esq., Jill Clark, PA, counsel for Plaintiffs.

Timothy S. Skarda, Esq., and Tracey L. Nelson, Esq., Minneapolis City Attorney's
Office, counsel for Defendants.

---

# INTRODUCTION

This matter is before the Court on a Motion for Summary Judgment brought by

Defendants City of Minneapolis, Richard Zimmerman, Steve Wuorinen, Kevin Lazarchic,

Scott Downing, and John Does 1-10 (collectively, "Defendants").  In their First Amended

Complaint, Plaintiffs Rickey Jones, Tammy Henderson, Deona Griffo, Brianna

Henderson, Alonzo Henderson, Marlon Henderson, John Pitts, Maxine Pitts, Lesley Moore, and Tami Moore (collectively, "Plaintiffs"), assert various causes of action against Defendants resulting from an incident with the police that occurred at a party at 1314 Marquette Avenue ("Marquette Place") in Minneapolis, Minnesota, on the evening of November 22, 2002, and into the wee hours of November 23, 2002.  Specifically, plaintiffs assert violations of 42 U.S.C. § 1983, assault, battery, malicious prosecution, false imprisonment, intentional interference with contract, and conversion.[1]  For the reasons set forth below, Defendants' motion is granted in part and denied in part.

## BACKGROUND

Prior to the events giving rise to this action, Marlon Henderson and John Pitts organized a birthday party for Marlon Henderson and another friend, "Kiesha,"[2] in the 35th floor party room of Marquette Place.  John Pitts' mother, Maxine Pitts, worked at Marquette Place, and gave her son permission to hold the party there.  Maxine Pitts and her co-worker at Marquette Place, Deona Griffo, assisted in the arrangements for the party.  Marlon Henderson advertised the party by distributing flyers to friends and acquaintances.  Marlon Henderson also testified that he hired bouncers as security for the party and that these bouncers searched people at the door.

---

[1]     In Plaintiffs' Memorandum of Law Opposing City Defendants' Motion for Summary Judgment Corrected, Plaintiffs agreed to the dismissal of Brianna Henderson as a Plaintiff, the Monell claims against the City of Minneapolis, claims brought pursuant to 42 U.S.C. § 1981, and Plaintiff Rickey Jones' First Amendment retaliation claim.

Plaintiffs contend that those throwing the party and their family and friends spent days purchasing food and supplies for the party, cooking, and decorating. Plaintiffs also contend that John Pitts, Marlon Henderson, and Kiesha spent several thousand dollars on food and top-shelf alcohol for the party. However, Plaintiffs have no documentation of their expenses.

Approximately 200 people attended the party. (Dep. of John Pitts ("J. Pitts Dep.") at 25.) Videotape of the party provided to the Court demonstrates that at least during the time elapsed on the videotape, the atmosphere of the party was relatively calm. At some point during the evening, however, the party reached capacity[3] and Maxine Pitts attempted to end the party. (*Id*. at 27.) An incident report written by Aleathea Garry, the security person at the front desk at Marquette Place during the relevant time, indicates that at approximately 11:46 p.m., Maxine Pitts "came down from the party room to inform me that the police needed to be called because the guest[s] in the front entryway were not leaving and the party had reached its party capacity limit." (Decl. of Jill Clark ("Clark Decl.") Ex. 3-2 at 2.) Someone shut the music off, but many guests did not listen when Maxine Pitts told them that the party had ended. (J. Pitts Dep. at 27-28.)

Richard Zimmerman is a Sergeant in the Homicide Unit of the Minneapolis Police Department who also works off-duty as a security consultant for Fine Associates, the

---

2       Kiesha's last name is unknown.
3       By all accounts, the maximum capacity of the party room was 200 people.

company that owns Marquette Place.  Zimmerman was at home the evening of November

22, 2002, having just returned from working a homicide, when he received a call from

Aleathea Garry.  Zimmerman contends that Aleathea Garry told him that people were

"filling up the building lobby, holding open doors, and causing a problem in the party

room" and that a party was "out of control."  (Aff. of Richard Zimmerman ("Zimmerman

Aff.") at ¶¶ 5-6; *see also* Dep. of Richard Zimmerman ("Zimmerman Dep.") at 23.)

Zimmerman told Aleathea Garry that he would send a squad car.  (Clark Decl. Ex. 3-2 at

2.)  Maxine Pitts asserts that she got on the phone with Zimmerman and told him that the

party had ended and that the only thing needed was to have people leave the outer door

area of the lobby.  (Dep. of Maxine Pitts ("M. Pitts Dep.") 21-22.)  At approximately

11:54 p.m., Zimmerman called 911[4] and notified the police that people were "filling up

the lobby coming into the building and won't leave."  (Clark Decl. Ex. 10.)  Although

Zimmerman's duties with Fine Associates did not include law enforcement activities such

as arresting people or providing hands-on security services (Zimmerman Aff. at ¶ 4),

Zimmerman decided to "go over there, tell the person who was having the party that they

needed to calm it down."  (Zimmerman Dep. at 24.)

     When Zimmerman arrived at Marquette Place at approximately 12:04 a.m. (Clark

---

4     It is not entirely clear to the Court whether this and subsequent calls that
Zimmerman made to the police were made to the emergency 911 line or to the
non-emergency police number.  The Court notes, however, that the lack of clarity on this

(Footnote Continued on Next Page)

Decl. Ex. 3-2 at 2), the squad car that he had called for had not yet arrived.  Zimmerman

observed a large crowd entering the building, standing around, and holding open doors to

the building to allow others inside.  (Zimmerman Aff. at ¶ 7.)  He spoke to Maxine Pitts

and to the person working at the front desk, and was told that the party was "out of

control."  (*Id.* at ¶ 9.)  Eventually, Zimmerman learned that Maxine Pitts was a host of the

party.  (*Id.* at ¶ 11.)  Maxine Pitts asserts that Zimmerman told her that she was "fired."[5]

(M. Pitts Dep. at 14-15, 20-21.)

Zimmerman and Maxine Pitts then took the elevator to the 35th floor party room.

Zimmerman contends that he had difficulty exiting the elevator because of the size of the

crowd in the elevator lobby.  (Zimmerman Aff. at ¶ 12.)  Zimmerman asserts that when he

attempted to get into the party room, he was told that there was a $3.00 admission fee.

(*Id.* at ¶ 13.)  Plaintiffs contend that once Zimmerman arrived at the party, he was eating

food, drinking, and walking around swinging a magnum of champagne in each hand.  (M.

Pitts Dep. at 27.)  Maxine Pitts asserts that when she attempted to begin cleaning the party

room, Zimmerman told her, "you are not cleaning up, you're getting . . . you're fired!"

(M. Pitts Dep. at 26-27.)

Zimmerman contends that he walked through the party room and observed drinks

---

(Footnote Continued From Previous Page)
point does not persuade the Court either way when reaching its ultimate decision.

5       Plaintiffs acknowledge that "[t]here is no evidence that Zimmerman was entrusted
with human-resources duties [at Marquette Place] or employee termination decisions for
Fine [Associates]."  (Pls. Mem. of Law Opp. City Defs.' Mo. for Summ. J. Corrected at

(Footnote Continued on Next Page)

being sold from two bar locations, and that he observed two women rolling marijuana cigarettes and placing them in a bowl.[6]   (*Id*. at ¶¶ 14-15.)  Zimmerman asserts that after observing the marijuana, he identified himself as a police officer and said that the party was illegal.  (*Id*. at ¶ 16.)  Zimmerman later stated that he believed the party was illegal because liquor was being sold without a license and because marijuana was being used on the premises.  (*Id*. at ¶ 17.)  According to Aleathea Garry, at approximately 12:10 a.m., Zimmerman called the front desk from the party room to see if the squad car had arrived, and Zimmerman told Aleathea Garry that "there was liquor being sold and drugs on the premises."  (Clark Decl. Ex. 3-2 at 2.)

At approximately 12:12 a.m., Zimmerman called 911 again, stating, "I'm at 1315 Marquette with an unruly crowd, uh and uh these people are smokin' dope up here in the Party Room, trying to get people to leave and they're causing problems for me."  (Clark Decl. Ex. 10.)  Although Zimmerman stated that it was not a "help" (i.e., officer in need of assistance) call, Zimmerman stated, "it's a little bit threatening in here now" and that he was "going to need more than one squad."  (*Id*.)  Zimmerman alleges that he called 911 from the party room because he believed the police should be notified of the illegal

---

(Footnote Continued From Previous Page)
5.)
[6]      Plaintiffs assert  that the family and friends who were bartending were not charging for drinks, but Plaintiffs acknowledge that they were accepting tips for their services.  In addition, Plaintiffs assert that no one was rolling marijuana cigarettes at the party.  However, Plaintiff John Pitts testified that he smelled marijuana and observed it being used in an area near the balcony.  (J. Pitts Dep. at 26, 32-33, 84.)

drugs at the party.  (Zimmerman Dep. at 58-59.)  Then, after Zimmerman announced that the party had to end, he asserts that three unidentified men began to rapidly approach him, came within three inches of him, and appeared hostile.  (Zimmerman Aff. at ¶ 20.)  As the men approached, Zimmerman called 911 again, ultimately asking for police assistance as a "help" (*i.e.*, officer in need of assistance) call because he felt threatened.  (*Id*. at ¶ 22.) The transcript of this final "help" call reads as follows:

| 911: | Police and fire. |
|---|---|
| Zimmerman: | Yeah this is off-duty Sergeant Zimmerman.  I'm busting this tipping [sic] house party, 1314 Marquette, I asked for some squads . . . a while ago. |
| 911: | Oh, they're, they should be arriving.  Actually, I show 713 already arriving  . . . where |
| Zimmerman: | Ok, if you just want to put that out, this is a tippling house. Uh, you know they're selling booze, there's drugs going on up here, I just threw some people out who were selling weed up here, to let them know that it is an open tippling house and to be careful coming up.  I'm upstairs right now, I'm in plain clothes wearing a coat and tie. |
| 911: | Ok, do you want to make this a help call? |
| Zimmerman: | Um . . . yes. |
| 911: | Ok. |

(Clark Decl. Ex. 10 at 3.)  Undisputedly, Zimmerman had no physical contact with the men who allegedly threatened him.

Plaintiffs contend that approximately fifty officers responded to Zimmerman's "help" call.  According to Aleathea Garry, at 12:17 a.m., seventeen police officers arrived

7

on the scene in the midst of a chaotic scene.  (Clark Decl. Ex. 3-2 at 2.)  An elevator was stuck between floors with passengers inside it, a freight elevator was stuck, and the elevator repair people were called.  (*Id*.)  Aleathea Garry reported that the police officers were having trouble getting to the party room.  (*Id*.)  Then, at approximately 12:30 a.m., a fire alarm went off that could not be silenced.  (*Id*.)  A police canine was barking in the lobby.  (*Id*. at 3.)  Apartment dwellers were calling with complaints.  (*Id*.)

Upon their arrival, Officers Scott Downing, Kevin Lazarchic, and Steve Wuorinen took  the elevator to the 35th floor with eight or ten other officers. (Dep. of Kevin Lazarchic ("Lazarchic Dep.") at 6-7; Aff. of Scott Downing ("Downing Aff.") at ¶ 3.) The elevator lobby was filled with a large crowd of people who were tightly packed into the small space, and Defendants assert that the crowd would not let the officers off the elevator.  (Downing Aff. ¶ 4; Dep. of Scott Downing ("Downing Dep.") at 10-16.) Downing testified that the people in the crowded elevator lobby were "pushing back at us, [with] verbal obscenities were being hollered at us."  (Downing Dep. at 10, 12-13.) Specifically, Downing stated that he heard people say "fuck the police" and "you're not getting in here" as the people tried to restrict their movement.  (*Id*. at 13, 15.)  Someone threw a "glass of booze" in Lazarchic's face.  (Lazarchic Dep. at 13, 27.)  Undisputedly, the officers began spraying mace into the crowd  to get the people to disperse while the officers attempted to respond to Zimmerman's "help" call.  (Downing Aff. at ¶ 5.)  Then, at some point, the fire alarm went off and prevented the elevators from running.

Wuorinen saw a female fall backwards to the ground and heard other officers radio

8

for paramedics and fire rescue.  (Dep. of Scott Wuorinen ("Wuorinen Dep.") at 27.)
Lazarchic testified that the officers formed a wall in front of the woman who had fallen in
an attempt to keep the crowd away and to allow access for medical personnel.  The
woman who had fallen was Plaintiff Tammy Henderson.

As the police officers entered the party room, Plaintiffs contend that various
people in the crowd were pushed and shoved as the officers attempted to locate the officer
who needed "help."  Eventually, at least one officer stated that when he located
Zimmerman, Zimmerman told him to "air to slow the cars down and that this was not a
help call."  (Clark Decl. Ex. 19B.)

Plaintiffs contend that the partygoers were ultimately forced down the stairs and
disallowed from cleaning up or from collecting their belongings, including the unused
alcohol, from the party room.  Further, Plaintiffs assert that elevator service was restored
at 1:05 a.m., thus negating the police's need to force everyone down the stairs.

Plaintiffs also assert that after the partygoers left the building, the police remained.
Plaintiffs contend that the police not only stole or discarded all of the top-shelf alcohol
that remained behind once the partygoers left, but that the police also "trashed" the party
room to make it appear that the party was more rowdy than it had been.

Plaintiffs further assert that Zimmerman went to Marquette Place the morning after
the party and instigated the firing of Maxine Pitts and Deona Griffo.

The Court will address separately the allegations of each Plaintiff.

**Rickey Jones**

Rickey Jones is an African-American man who was hired to videotape the party at Marquette Place.  (Aff. of Rickey Jones ("Jones Aff.") at 2.)  Jones asserts that he was in the elevator lobby attempting to retrieve his cameras when the police arrived.  Jones began to tape the woman who had fallen to the floor when officers yelled to get the camera from him.  (Dep. of Rickey Jones ("Jones Dep.") at 52.)

Defendants assert that when the police arrived, Jones was repeatedly told to leave along with the rest of the crowd.  (Wuorinen Dep. at 31.)  Wuorinen testified that Jones "repeatedly pushed his way back towards the doorways and stood near the door attempting to videotape everything that was going on inside the room" and that Jones was "encouraging others not to leave and follow our directions to leave." (*Id.*)  Eventually, Wuorinen arrested Jones because, Wuorinen asserts, Jones did not leave as Wuorinen had directed.  (*Id.* at 35.)  Wuorinen asserts that he took Jones by the arm and Jones began to struggle as Wuorinen attempted to handcuff him.  (Wuorinen Dep. 40-41, 45.)  Lazarchic noticed the struggle and grabbed Jones around the collar in an attempt to hold him still. (Lazarchic Dep. at 28-32.)

Downing saw Wuorinen struggling with Jones.  (Downing Aff. ¶ 6.)  Downing stated that Jones kicked him (Downing) in the right knee.  (Downing Aff. ¶ 9.)  At that point, Downing asserts that he delivered approximately five to eight open-handed strikes to Jones' shoulder and head area and approximately three knee strikes to Jones' left arm in an attempt to get Jones' hands behind his back.  (*Id.*)  Jones contends that he was

punched or struck in the face (by an officer and/or by his own camera), knocked down to the ground, and kneed or kicked in the ribs.  (Jones Dep. at 14, 17-22.)  Jones' face was cut and he suffered pain in his ribs that lasted for three or four days.  (*Id*. at 15.)  Jones believes that he was not struck or kicked after he was handcuffed.  (*Id*. at 23.)

Jones was arrested for obstructing justice.  At some point after the officers handcuffed Jones, the fire alarm went off and the elevators quit working.  (Downing Aff. at 10.)  Jones asserts that after he was arrested and handcuffed, the officers walked him down the stairs from the 35th floor.  Jones asserts that as he was being walked down the stairs, Wuorinen told him, "why don't you run so I can shoot your black ass."  (Jones Dep. at 62.).  Jones received medical treatment at Hennepin County Medical Center for a facial cut and was booked into jail.  The photograph taken of Jones at Hennepin County Medical Center shows a large welt and laceration on Jones' right temple.  (Clark Decl. Ex. 6.)

Ultimately, a state court judge dismissed the charges against Jones for lack of probable cause.  Aside from being treated at Hennepin County Medical Center on the night at issue, Jones received no other medical or psychological help for his alleged injuries.

**Tammy Henderson**

Tammy Henderson is an African-American woman who attended the party at Marquette Place.  According to other Plaintiffs, Tammy Henderson was just recovering from a stroke when she attended the party, and she suffered from asthma and high blood

pressure.  Plaintiffs contend that when the officers came off of the elevator, they maced

Tammy Henderson and kept macing her even as she was falling to the floor.  (Dep. of

Alonzo Henderson ("A. Henderson Dep.") at 20, 24; Dep. of Marlon Henderson ("M.

Henderson Dep.") at 34-35.)  One witness, Lesley Moore, stated that after Tammy

Henderson was maced, an unidentified police officer told her to get up and pulled her

across the floor.  (Dep. of Lesley Moore ("L. Moore Dep.") at 18.  Lesley Moore also

stated that she saw Tammy Henderson's family members attempting to help Tammy

Henderson after she had collapsed, but that police kept the family members from giving

Tammy Henderson assistance.  (*Id*.)  The police called for paramedic assistance, but

according to the First Amended Complaint, Tammy Henderson refused treatment when

help arrived.  (First Am. Compl. at ¶ 47.)

According to Plaintiffs, when Tammy Henderson's family members later inquired

as to her condition, they were told that she had died on the way to the hospital.  (*See, e.g.*,

M. Henderson Dep. at 36-37.)  Plaintiff Lesley Moore asserts that when she inquired as to

Tammy Henderson's condition, an officer told her that the officer did not know the

condition and that Tammy Henderson could be dead for all they know.  (L. Moore Dep. at

21.)

Plaintiffs have provided no medical evidence to support their allegations regarding

Tammy Henderson's medical condition before or after this incident.  According to

Defendants' counsel, Plaintiffs' counsel has represented that Tammy Henderson suffered

a stroke and has been disabled since the incident and has little or no personal recollection

of the events that occurred. (Aff. of Timothy Skarda at ¶ 15.)

**Deona Griffo**

Deona Griffo is an African-American woman who was employed by Marquette Place and attended the party. Griffo asserts that she was pushed and shoved in the commotion as the police moved through the elevator lobby. (Dep. of Deona Griffo ("Griffo Dep.") at 34-35.) Griffo stated that she was not maced directly, but that the mace in the air bothered her eyes and nose. (*Id*. at 51.) She also broke the heel of her boot while she was walking down the stairs from the party room, but she was not physically injured. (*Id*.) After the event in question, Griffo was told by her supervisor that she was being terminated as a result of what had happened at the party. (*Id*. at 50-51.) Here, Griffo asserts a wage-loss claim against Zimmerman resulting from his alleged involvement in her termination. Griffo never made a claim for unemployment compensation and she did not contest the termination. Griffo testified that she suffered depression as a result of the incident, but she was never treated for it or for any alleged physical injuries. (*Id*. at 19, 51.)

**Maxine Pitts**

Maxine Pitts is an African-American woman who was employed by Marquette Place and attended the party. She asserts that Zimmerman told her that she was "fired" on at least two occasions on the night of the party and then interfered with her employment contract to get her fired. (First Am. Compl. at ¶ 65.) She asserts a wage-loss claim against Zimmerman as a result of his alleged involvement in her termination from

13

Marquette Place.  Maxine Pitts testified that no police officer touched her in any way during the incident at issue.  (M. Pitts Dep. at 31.)

**John Pitts**

John Pitts is an African-American man who attended the party at Marquette Place. John Pitts was involved in planning the party.  He alleges that he spent approximately $3,000.00 on alcohol and room rentals for the party.  (J. Pitts Answer to Interrog. 15.) Pitts has no receipts for his expenses.  (J. Pitts Dep. at 20.)

John Pitts was not directly sprayed with mace, but he breathed mace that was in the air and suffered from burning skin, itching and burning eyes, coughing, difficulty breathing, and the inability to get fresh air.  (J. Pitts Dep. at 44; J. Pitts Answer to Interrogatory 15.)  John Pitts asserts that he was shoved when the officers were in the elevator lobby, but admits that he was not grabbed, punched, or otherwise the victim of force.  (*Id*.)  John Pitts asserts that he suffered emotional injuries such as distress, stress, anxiety, humiliation, and fear as a result of this incident.  (*Id*.)

**Lesley Moore**

Lesley Moore is an African-American woman who attended the party at Marquette Place.  Lesley Moore testified that no police officer ever touched her, and that she sustained no physical injury.  (L. Moore Dep. at 19, 23-34.)  As a result of this incident, Lesley Moore asserts that she suffered humiliation and a fear of being harmed.  (*Id*. at 23-24.)  Lesley Moore testified that the officers told her and others to leave the party by walking down the stairs.  (*Id*. at 19.)  Lesley Moore asserts that she heard an officer say,

14

"You niggers better get out of here otherwise you're going to get thrown down the stairs."
 (*Id.* at 14.)

**Alonzo Henderson**

Alonzo Henderson is an African-American man who attended the party at Marquette Place.  He asserts that he was pushed when the officers told the partygoers that they needed to leave the party room.  (A. Henderson Dep. at 17.)  Alonzo Henderson asserts that he attempted to assist his mother, Tammy Henderson, after he saw her collapse from the mace.  (*Id.* at 24-25.)  He states that an officer grabbed him from behind, kept from attending to his mother, and guided him to the stairs.  (*Id.*)  Alonzo Henderson asserts that an officer pushed him down the stairs and that he stumbled, but caught his balance and did not fall.  (*Id.* at 25, 32.)  Alonzo Henderson testified that he did not suffer any physical injury or pain as a result of his contact with the officers.  (*Id.* at 32.)  He contends that he would "never forget" the incident.  (*Id.* at 34.)  Alonzo Henderson did not seek treatment for any of his alleged physical or emotional injuries. (*Id.* at 35.)

**Tami Moore**

Tami Moore is an African-American woman who attended the party at Marquette Place.  She alleges that she was near Rickey Jones while the police were scuffling with him and that Jones handed her one of his cameras to keep it from being broken.  (T. Moore Dep. at 17-18.)  Tami Moore contends that as she was reaching for the camera, an unidentified police officer came from behind and struck her on the back of the neck.  (*Id.*

at 17-20.)  Tami Moore is unsure if she was hit with a body part or something the officer

was holding.  (*Id*. at 20.)  She was dazed as a result of the hit but did not fall down.  (*Id*. at

20-21.)  Then, someone forcefully removed the camera out of her hands and told her to

move along.  (*Id*. at 21.)  Tami Moore experiences neck pain and stiffness when she sits

for a long time, but has not received medical treatment for the injury to her neck.  (*Id*. at

30, 31.)

**Marlon Henderson**

Marlon Henderson is an African-American man who attended the party at

Marquette Place and helped organize it.  He asserts that the police locked him outside on

a patio during the party, pushed him down a flight of stairs, and prevented him from

helping his aunt, Tammy Henderson.  Marlon Henderson alleges that he spent between

$700.00 and $800.00 on party supplies, yet he has no receipts indicating how much he

spent.  (M. Henderson Dep. at 16-18.)  Marlon Henderson describes his injuries as

embarrassment, humiliation, or emotional or psychological injuries.  (*Id*. at 8-9.)  Marlon

Henderson testified that he received no physical injuries from the incident with the police

and did not require any medical treatment, including psychological treatment.  (*Id*. at 8-9.)

## DISCUSSION

### I.      Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the

moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The Court

must view the evidence and the inferences, which may be reasonably drawn from the

evidence in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II.    Qualified Immunity and Federal Claims

Defendants contend that they are protected by qualified immunity against Plaintiffs' federal claims. Qualified immunity shields government officials as well as private individuals from civil liability under 42 U.S.C. § 1983. *Wilson v. Layne*, 526 U.S. 603, 614 (1999). A defendant is shielded from civil liability if it is shown that his or her "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

17

On a motion for summary judgment, the Court employs a three-part test to determine whether qualified immunity exists.  *Goff v. Bise*, 173 F.3d 1068, 1072 (8th Cir. 1999) (citing *Habiger v. City of Fargo*, 80 F.3d 289, 295 (8th Cir. 1996)).  First, the plaintiff must assert a violation of a constitutional right.  *Id.*  Second, the alleged right must be clearly established.  *Id.*  Third, taking the facts in the light most favorable to the plaintiff, there must be no genuine issues of material fact as to whether a reasonable official would have known that the alleged action violated the plaintiff's clearly established rights.  *Id.*  If the Court determines that the facts, viewed in the light most favorable to the injured party, do not establish a violation of a constitutional right, no further inquiry is necessary.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  "Qualified immunity is available 'to all but the plainly incompetent or those who knowingly violate the law.'"  *Avalos v. City of Glenwood*, 382 F.3d 792, 798 (8th Cir. 2004) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

## A.    Excessive Force Claims under 42 U.S.C. § 1983

All Plaintiffs assert excessive force claims against all of the Defendants. Specifically, Plaintiffs assert that the police officers involved used force when no force was necessary.  Defendants, on the other hand, assert that they are entitled to qualified immunity on Plaintiffs' claims of excessive force.

The Court evaluates excessive force claims under an objective-reasonableness test. *Graham v. Connor*, 490 U.S. 386, 397 (1989).  In determining whether the use of force is "reasonable" under the Fourth Amendment, a court must balance "the nature and quality

18

of the intrusion on the individual's Fourth Amendment interests" against the government's interests at stake. *Id*. at 396 (citation omitted). The reasonableness of the use of force must be judged from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *See id*. (quoting *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)). The reasonableness determination also must make allowances for the fact that police officers make split-second judgments in oftentimes tense situations. *Graham*, 490 U.S. at 396-97. Therefore, the United States Supreme Court has set out the reasonableness inquiry as one that requires courts to determine "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id*. at 397 (citing *Scott v. United States*, 436 U.S. 128, 137-39 (1978)). "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Graham*, 490 U.S. at 396 (citations omitted).

The Eighth Circuit has ruled that the minimum level of injury required for a Fourth Amendment excessive force claim is actual injury. *Lambert v. City of Dumas*, 187 F.3d 931, 936 (8th Cir. 1999); *Dawkins v. Graham*, 50 F.3d 532, 535 (8th Cir. 1995). The Eighth Circuit has held that the following examples constitute "actual injury": (1) "bruises and a facial laceration"; (2) "bruised knees and elevated blood pressure"; (3) "posttraumatic stress disorder"; or (4) a "single small cut of the lateral right eyelid and small scrapes of the right posterior knee and upper calf." *Lambert*, 187 F.3d at 936

19

(citations omitted).  However, the Eighth Circuit has ruled that "a de minimus . . . injury is insufficient to support a finding of a constitutional violation."  *Crumley v. City of St. Paul*, 324 F.3d 1003, 1007 (8th Cir. 2003); *see also Andrews v. Fuoss*, 417 F.3d 813, 818 (8th Cir. 2005) (concluding that injuries including a sore neck, horrible headache, painful flare-up of pre-existing back injuries resulting from defendant's forceful hit were insufficient to establish an excessive-force claim).  Thus, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment."  *Id.* (quotation omitted).

The evidence before the Court demonstrates that Rickey Jones suffered, at minimum, a laceration and bruising as a result of the police officer's conduct.  As a result, Jones has sufficient evidence of actual injury to overcome Defendants' assertions of qualified immunity and thus survive summary judgment.  The Court notes that in so holding, the Court is not concluding that, as a matter of law, excessive force was used.  Rather, the Court is concluding that a reasonable jury could conclude, on the facts at issue here, that excessive force was used.

As to the remaining Plaintiffs' claims of excessive force, the Court finds that summary judgment is appropriate.  When the police arrived in the elevator lobby, the elevator lobby was packed tightly with partygoers.  The police officers, believing that they were responding to a help call, and thus that an officer was in distress, deployed mace in an attempt to disperse the crowd and clear the path through the partygoers who would not let them through.  To the extent that the remaining Plaintiffs have alleged

injury, any allegations of injury, such as the physical contact, or pushing and shoving, between officers and partygoers as the police made their way through the crowd or attempted to direct the partygoers down the stairwell, were merely de minimus and not sufficient to establish Fourth Amendment claims.[7]  The same holds true for the de minimus nature of the injuries suffered by Plaintiff Tami Moore.  Consequently, Plaintiffs Tammy Henderson, Deona Griffo, Alonzo Henderson, Marlon Henderson, John Pitts, Maxine Pitts, Lesley Moore, and Tami Moore have not established that Defendants violated their constitutional rights to be free from excessive force.  Accordingly, Defendants are entitled to qualified immunity and the Court grants summary judgment on Plaintiffs' (aside from Plaintiff Rickey Jones') claims of excessive force.

### B.    Substantive and Procedural Due Process Claims

Plaintiffs contend that Defendants violated their substantive and procedural due process rights.  To establish a substantive due process violation, Plaintiffs must show that Defendants' conduct:  (1) was "conscience shocking" and (2) violated "one or more fundamental rights that are deeply rooted in this Nation's history and tradition, and

---

[7]     The Court notes that although the officers' conduct in dispersing the crowd is not actionable, the Court is very troubled by the allegations that officers used racial epithets toward many of the partygoers.  Use of such language by law enforcement officers is utterly intolerable, irrespective of the circumstances.  Moreover, while the Court has already observed that such language is not actionable in a constitutional sense, there is no indication in the record whether the officers were ever disciplined if in fact they acknowledged that they used such racial slurs and epithets, and what the departmental policy is when officers use such provocative and offensive language.  By its decision, the

(Footnote Continued on Next Page)

implicit in the concept of ordered liberty, such that neither liberty nor justice would exist

if they were sacrificed." *Terrell v. Larson*, 396 F.3d 975, 978 n.1 (8th Cir. 2005) (citation

omitted).  The United States Supreme Court has noted that "if a constitutional claim is

covered by a specific constitutional provision, such as the Fourth or Eighth Amendment,

the claim must be analyzed under the standard appropriate to that specific provision, not

under the rubric of substantive due process." *U.S. v. Lanier*, 520 U.S. 259, 271 n.7

(1997) (citing *Graham*, 490 U.S. at 394.)

The First Amended Complaint contends that Defendants violated Plaintiffs'

"[s]ubstantive and/or procedural" due process rights as follows:

> Defendants' actions, including but not limited to:  misusing public-
> supported police services for unlawful reasons or to benefit a corporate
> entity or for personal interests; unprovoked and unjustified attacks on
> African Americans who were merely attending a birthday party; attacking
> Jones merely for videotaping; attacking others who had the ability to
> photograph/videotape police misconduct; falsifying police reports in order
> to misuse the criminal justice system; harassing Jones for complaining of
> police misconduct – shock the conscience of the community.

(First Am. Compl. ¶ 51(a).)  In their briefing, Plaintiffs appear to narrow their claim to

one of substantive due process.  As to the allegations that support their claim, Plaintiffs

first point to the police misconduct in deploying mace.  Second, Plaintiffs propose that

Zimmerman falsified the "help" call, knowing that the police would arrive in short shift,

and then failing to protect the partygoers from over-zealous junior officers who responded

---

(Footnote Continued From Previous Page)
Court does not intend to condone, in any manner, the use of such language by law

(Footnote Continued on Next Page)

to the call.  Third, Plaintiffs contend that officers prevented private aid to Plaintiff

Tammy Henderson by physically keeping her family members from assisting her when

she was allegedly injured by the mace.  Finally, Plaintiffs contend that Zimmerman and

other police officers conspired to cover up their misconduct related to the party.

The Court finds no support for Plaintiffs' claims of a substantive due process

violation.  Specifically, Plaintiffs have not clearly asserted the deprivation of a protected

liberty or property interest.  For the most part, Plaintiffs' claims are based upon conduct

that is not appropriately analyzed under the substantive due process framework.  As a

result, summary judgment is appropriate on these claims.

### C.    Equal Protection

Plaintiff Rickey Jones asserts that he, a "class of one," was denied equal protection

of the laws in that because of his camera, he was treated differently from others who were

similarly situated, specifically, those partygoers in the elevator lobby who did not leave

but were not arrested.  (Pls.' Mem. of Law Opposing City Defs.' Mo. for Summ. Jt.

Corrected ("Pls. Mem. in Opp'n") at 40.)  In other words, Jones' argument is not that he

was treated differently because of his race, but rather that he was treated differently

because of his status as a camera-wielder.  The Court is aware of no legal precedent that

supports Rickey Jones' Fourteenth Amendment claim based on his "class of one" person

holding a camera.  Accordingly, Rickey Jones' equal protection claim is dismissed.

_____

(Footnote Continued From Previous Page)
enforcement officers.

### D.     Conspiracy Claims

Plaintiffs assert that Defendants conspired to violate their constitutional rights, purportedly pursuant to 42 U.S.C. § 1983.  (Pls. Mem. in Opp'n at 39-40.)  Plaintiffs contend that they are not asserting a conspiracy pursuant to 42 U.S.C. § 1985(3), yet Plaintiffs' only case citation is to a case that provides the elements of a § 1985 conspiracy.  (*Id.*)  Regardless of this perplexity, the Court finds that Plaintiffs have not set forth evidence to support their claim of conspiracy.  Plaintiffs' argument, to the extent that it is intelligible, is based upon mere speculation.  As a result, summary judgment is appropriate on Plaintiffs' conspiracy claims.

### E.     Failure to Protect Claims

An officer may be liable for failing to intervene when another officer uses excessive force.  *Putman v. Gerloff*, 639 F.2d 415, 423-24 (8th Cir. 1981).  Here, Plaintiffs assert that Zimmerman "admits that he was watching will [sic] Jones was attacked and beaten for his camera."  (Pls. Mem. in Opp'n at 39.)  In support of this proposition, Plaintiffs cite to a paragraph in Zimmerman's affidavit which states, "After police arrived, I saw officers trying to handcuff a male in a suit who I later learned was Rickey Jones."  (Zimmerman Aff. ¶ 26.)  To the extent that Plaintiffs may have articulated a comprehensible argument regarding Zimmerman's failure to protect, Plaintiffs offer no support on the record for their argument that Zimmerman was in a position to intervene while the alleged excessive force took place.  Thus, summary judgment is appropriate on this claim.

24

### III.     Official Immunity and State Law Claims

Under Minnesota law, public officials are automatically entitled to official immunity from state law claims when their duties require the exercise of discretion, so long as the officer is not guilty of a willful or malicious wrong.  *Johnson v. Morris*, 453 N.W.2d 31, 41-42 (Minn.1990); *Elwood v. Rice County*, 423 N.W.2d 671, 677 (Minn. 1988).  Thus, to determine whether official immunity is available in any given context requires a determination of whether the alleged acts were discretionary or ministerial and whether the alleged acts were malicious or willful.  *Davis v. County of Hennepin*, 559 N.W.2d 117, 122 (Minn. Ct. App. 1997).

Malice, in the official immunity context, means intentionally committing an act that the official has reason to believe is legally prohibited. This is an objective inquiry that examines the legal reasonableness of an official's actions.  *State by Beaulieu v. City of Mounds View*, 518 N.W.2d 567, 571 (Minn.1994).  An officer does not commit a willful and malicious wrong unless the officer relies on information that the officer knows to be false.  *Johnson v. County of Dakota*, 510 N.W.2d 237, 240 (Minn. Ct. App. 1994). To overcome a defense based on official immunity, a plaintiff cannot rely on "bare allegations of malice"; rather, a plaintiff must present specific facts evidencing bad faith. *Harlow*, 457 U.S. at 817.

### A.      Assault and Battery

Plaintiff Rickey Jones asserts state law causes of action for assault and battery against Defendants Wuorinen, Downing, and Lazarchic.  The remaining Plaintiffs assert state law causes of action for assault and battery against Defendants John Does 1-10 and the City of Minneapolis.  Defendants contend that they are entitled to official immunity on the assault and battery claims.

An assault is an unlawful threat to do bodily harm to another with the present ability to carry out the threat.  *Johnson v. Morris*, 453 N.W. 2d 31, 41 (Minn. 1990).  Battery is "an intentional, unpermitted offensive contact with another."  *Id*. at 40.

Because Rickey Jones' claims of excessive force remain, summary judgment is inappropriate on Rickey Jones' state law claims of assault and battery.  As to any remaining Plaintiffs, however, Defendants are entitled to official immunity and summary judgment is granted on these claims.

### B.      Malicious Prosecution

Plaintiff Rickey Jones asserts a cause of action for malicious prosecution against all Defendants.  The elements of a claim for malicious prosecution are:  (1) the defendant's initiation of criminal proceedings against the accused party without probable cause; (2) malice; and (3) termination of the proceedings in favor of the accused party.  *Henry v. City of Minneapolis*, 512 F. Supp. 293, 295 (D. Minn.1981) (citing *Jones v. Flaherty*, 165 N.W. 963 (Minn.1917); *Rosvall v. Provost*, 155 N.W.2d 900 (Minn. 1968); and *Martin v. Cedar Lake Ice Co.*, 177 N.W. 631 (Minn. 1920)).

On the facts before the Court, the Court finds no support for Plaintiff Rickey Jones's claim of malicious prosecution. Wuorinen's decision to arrest Rickey Jones was based on probable cause. Wuorinen testified that he was attempting to control the crowd and that Jones repeatedly refused to obey orders to step back. As a result, summary judgment is granted on Plaintiff Rickey Jones' claim of malicious prosecution.

### C.      False Imprisonment

All Plaintiffs allege claims of false imprisonment against all Defendants. Plaintiffs assert that they were falsely imprisoned by Defendants on the top floor of Marquette Place. In addition, Plaintiffs Tami Moore and Marlon Henderson contend that they were forced onto a patio or deck area as the police attempted to clear the lobby area of partygoers.

The common law regarding false imprisonment states that an individual may not, without legal justification, be confined against her or his will. *Gleason v. Metropolitan Council Transit Operations*, 563 N.W.2d 309, 319 (Minn. Ct. App. 1997); *see also Kleidon v. Glascock*, 10 N.W.2d 394, 397 (1943) (false imprisonment is any imprisonment that is not legally justifiable).

Here, Plaintiffs offer no support for their claim of false imprisonment. It is undisputed that the police officers were attempting to move the crowd from the 35th floor—quite the opposite of Plaintiffs' contentions of confinement. If anything, Plaintiffs and other partygoers were prevented from leaving the elevator lobby or the 35th floor because of the non-functioning elevators. Moreover, as to Plaintiffs Tami Moore and

27

Marlon Henderson's assertions that they were confined to the patio or deck area on the 35th floor, police were legally justified in attempting to clear the area, and Plaintiffs offer no evidence of bad faith or malice.  As a result, Plaintiffs claims of false imprisonment fail.

### D.     Intentional Interference with Contract

Plaintiffs Maxine Pitts and Deona Griffo assert a cause of action for intentional interference of contract against Defendant Richard Zimmerman.  Plaintiffs Maxine Pitts and Deona Griffo base their claim upon Zimmerman's alleged statement that Maxine Pitts and Deona Griffo were "fired," and further assert that Zimmerman subsequently made false statements to Marquette Place to ensure that they would be fired.

Under Minnesota law, a claim of intentional interference with contract requires proof of five elements:  (1) the existence of a contract; (2) the alleged wrongdoer's knowledge of that contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages.  *Storage Tech. Corp. v. Cisco Sys. Inc.*, 395 F.3d 921, 924 (8th Cir. 2005).

As noted by Plaintiffs, "[t]here is no evidence that Zimmerman was entrusted with human resources duties, or employment termination decisions for Fine [Associates]." (Pls. Mem. in Opp'n at 5.)  Plaintiffs have provided no evidence that Defendant Richard Zimmerman communicated with Marquette Place or Fine Associates in anything other than a good faith manner, merely reporting his version of the events that had occurred the night before.  As a result, Plaintiffs' claim for intentional interference with contract fails.

**E.     Conversion**

Plaintiffs Marlon Henderson and John Pitts assert a cause of action for conversion of a chattel against Defendants John Does 1-10 and the City of Minneapolis.  Specifically, Marlon Henderson and John Pitts contend that they suffered damages because the police willfully interfered with their ownership and possession of several thousand dollars worth of room rentals, supplies, and alcoholic beverages for the party at Marquette Place.

Minnesota law defines conversion as "an act of willful interference with the personal property of another which is without justification or which is inconsistent with the rights of the person entitled to the use, possession or ownership of the property." *Bloom v. Hennepin County*, 783 F. Supp. 418, 440 (D. Minn. 1992) (quoting *Dain Bosworth, Inc. v. Goetze*, 374 N.W.2d 467, 471 (Minn. Ct. App. 1985)).

Here, Plaintiffs offer nothing but pure speculation that the Police absconded with their food and beverages.  Plaintiffs have no documentation as to the nature or cost of their alleged expenses, and Plaintiffs have no way of proving the amount of food and beverages that were consumed or removed by other partygoers.  Because Plaintiffs' claim of conversion is based upon pure speculation, Plaintiffs' claim of conversion fails.

## CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that:

1.      Defendants' Motion for Summary Judgment (Doc. No. 35) is **GRANTED IN PART AND DENIED IN PART**, as follows:

      a.      Defendants' Motion for Summary Judgment as to Plaintiff

Rickey Jones' claims of excessive force, assault, and battery (Counts I, III, and IV of the First Amended Complaint, Doc. No. 33) is **DENIED**;

      b.     Defendants' Motion for Summary Judgment as to all claims by Plaintiffs Tammy Henderson, Deona Griffo, Brianna Henderson, Alonzo Henderson, Marlon Henderson, John Pitts, Maxine Pitts, Lesley Moore, and Tami Moore is **GRANTED**.  All counts of the First Amended Complaint as to these Plaintiffs, are **DISMISSED WITH PREJUDICE**.

      c.     Defendants' Motion for Summary Judgment as to Plaintiff Rickey Jones' claims of substantive and procedural due process violations, equal protection violations, failure to protect, conspiracy, malicious prosecution, false imprisonment is **GRANTED**.  These claims are **DISMISSED WITH PREJUDICE**.

Dated:  August 1, 2007        <u>s/Donovan W. Frank</u>
                                 DONOVAN W. FRANK
                                 Judge of United States District Court